## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 05 2020, 10:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

B.C.C., S.C. and B.C. (Minor Children),

And

H.D. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 5, 2020

Court of Appeals Case No.
19A-JT-2842

Appeal from the Orange Circuit Court

The Honorable Steven L. Owen, Judge

Trial Court Cause No.
59C01-1805-JT-117, 59C01-1805-JT-118, & 59C01-1805-JT-119

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, H.D. (Mother), appeals the trial court's termination of her parental rights to her minor children, B.C.C., S.C., and B.C. (Children).

We affirm.

## ISSUES

Mother raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by denying Mother's motion to dismiss because the fact-finding hearing was not commenced within ninety days of the filing of the petition to terminate parental rights; and

(2) Whether the Department of Child Services (DCS) presented sufficient evidence to support its petition to terminate the parent-child relationship.

## FACTS AND PROCEDURAL HISTORY

Mother and J.C. (Father)[1] are the biological parents to the Children, B.C.C., born on March 20, 2007, S.C., born on June 21, 2010, and B.C., born on June 6, 2011. In June of 2016, DCS received a report that the Children's ten-year-old half-brother (Sibling) had been sexually abused by Mother's "significant

---

[1] Father's parental rights to his Children were terminated by the trial court. He did not appeal this decision. Facts pertaining to Father will be included as necessary for this appeal.

others." (Exh. Vol. I, p. 64). Sibling disclosed that the Children had also been sexually abused. On June 27, 2016, DCS filed a petition alleging the Children were Children in Need of Services (CHINS) based on allegations that the Children were sexually abused and Mother knew of the abuse but failed to protect them. On March 29, 2017, the trial court conducted a fact-finding hearing at which Mother failed to appear but at which Mother's counsel appeared. The trial court adjudicated Children to be CHINS at the hearing. In its dispositional order, issued on July 20, 2017, the trial court ordered Mother to contact the DCS family case manager (FCM) on a weekly basis, notify the FCM of any changes to her address and employment, complete parenting and psychological assessments, keep appointments with DCS, the FCM, and the Children's guardian ad litem (GAL), obtain and maintain a safe and secure home, and attend all scheduled visitation with the Children.

[5] Throughout the CHINS proceedings, the trial court, in its review hearings, consistently found that Mother did not comply with the Children's case plan, had not visited the Children since August 11, 2016, did not participate in enhancing her parental abilities through services, and did not cooperate with DCS. On June 5, 2018, DCS filed its verified petition to terminate Mother's parental rights to the Children.

[6] During the hearing on DCS's petition for termination, Mother admitted that she had done nothing to support the Children since the dispositional order entered on July 20, 2017. She also conceded that she did not contact the FCM on a weekly basis, notify DCS of her change of address or employment, or

complete the parenting and psychological assessments. In November 2016, the phone number Mother had provided to DCS stopped working and her whereabouts were unknown throughout the majority of the proceedings. She admitted that she did not attend all scheduled visitation with the Children as she "kind of just gave up fighting." (Transcript Vol. II, p. 94). Before giving up, she had participated in ten out of twenty-four scheduled visits. During these visits, Mother was unable to redirect the Children or provide structure. Her last visit with the Children occurred in August 2016. At the time of the termination hearing, Mother was living with her boyfriend and his daughter and was working in Louisville. However, she also admitted that boyfriend was the individual the Children and Sibling claimed had molested them and he was a substantiated perpetrator of sexual abuse against Children and Sibling.

[7] The Children never returned to their Mother's care since their removal on June 24, 2016. They were placed in foster care together, and while B.C.C. was "often angry and sad" when Mother failed to visit, S.C. and B.C. do not remember who "their [M]other was." (Tr. Vol. II, p. 157). In September and November 2016, the Children participated in assessments. B.C.C. was diagnosed with PTSD, B.C. was diagnosed with PTSD and oppositional defiant disorder, and S.C. was diagnosed with ADHD and oppositional defiant disorder. DCS arranged for therapy services to address their past trauma, life skills coaching, mentoring services, as well as behavioral modification, and educational support. Although Children's behavior has improved since being placed in foster care, evidence at the termination hearing revealed that recently

S.C. has asked other children to touch his buttocks, and he had requested to touch theirs. B.C. and S.C. also were defecating and urinating in their pants or in other places in the house. As DCS considered these behaviors linked to sexual abuse and based on the substantiated finding of sexual abuse, DCS arranged for psychosexual evaluations. According to the therapist, B.C. had recently manifested some sexualized behaviors by asking a younger girl at daycare to show him her private parts.

[8] On October 25, 2019, the trial court entered its Order, terminating Mother's parental rights to the Children and concluding, in pertinent part, that:

> There is a reasonable probability that the conditions which resulted in [B.C.C., S.C., and B.C.'s] removal and continued placement outside the home will not be remedied by Mother [], based on
>
> a. The trauma experienced by the [C]hildren while in Mother's care[.]
>
> b. The neglect and physical abuse that occurred to the [C]hildren while in Mother's care[.]
>
> c. Mother and Father have failed to engage in and successfully complete any services necessary for the parent to reunify with the [C]hildren over the past three (3) years.
>
> d. Mother and Father failed to maintain a relationship with the [C]hildren for the past three (3) years.

Termination of Mother and Father's parental rights is in [B.C.C.'s] best interest.

Termination of Mother and Father's parental rights is in [S.C.'s] best interest.

Termination of Mother and Father's parental rights is in [B.C.'s] best interest.

There is a satisfactory plan for the care and treatment for [B.C.C., S.C., and B.C.,] that being adoption.

(Appellant's App. Vol. II, p. 189).

[9] Mother now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

### I. *Motion to Dismiss*

[10] Mother contends that the trial court abused its discretion when it denied her motion to dismiss the case because the fact-finding hearing was not commenced within ninety days of the filing of the petition to terminate her parental rights. She maintains that while DCS's petition was filed on June 5, 2018, the fact-finding hearing was not commenced until July 11, 2019, more than one and one-half year after the filing of the petition.

[11] Mother filed her motion to dismiss citing Indiana Code section 31-35-2-6, which provides:

(a) Except when a hearing is required after June 30, 1999, under section 4.5. of this chapter, the person filing the petition shall request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court shall:

(1) Commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and

(2) Complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.

(b) If a hearing is not held within the timeframe set forth in subsection (a), upon filing a motion with the court by a party, the court shall dismiss the petition to terminate the parent-child relationship without prejudice.

Based on the statutory language, Mother requests this court to interpret the 'hearing' required under the language of the statute as a fact-finding hearing.[2] Matters of statutory interpretation present pure questions of law and are thus reviewed *de novo*. *Matter of M.S.*, 140 N.E.3d 279, 282 (Ind. 2020). We presume that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id*.

---

[2] In support of her argument, Mother distinguishes *In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003), in which this court held that Indiana law does not require that an initial hearing or fact-finding hearing be set within a specific timeframe. However, *In re L.V.N.* is inapposite to the case before us as *L.V.N.* was decided under a previous version of the current statute which provided that the person filing the petition may request a hearing, and if a hearing is requested, the court shall commence a hearing not more than 90 days after the petition was filed. *See* P.L. 35-1998, Sec. 21.

[12] The record reflects that DCS filed its petition to terminate Mother's parental rights on June 5, 2018, and consequently, the ninety-day statutory period to commence a hearing fell on September 3, 2018. Although DCS's petition does not include a request for the court to set a hearing, DCS filed a separate motion requesting an initial hearing date. The record is undisputed that the trial court conducted an initial hearing on June 6, 2018. However, because Mother failed to appear, the court continued the hearing to which Mother's counsel, who was present, did not object. At the September 19, 2018 continued initial hearing, Mother did not object when the trial court scheduled the fact-finding hearing on November 16, 2018—outside the statutory timeframe of ninety days. On November 9, 2018, Father moved to continue this hearing because he was incarcerated and was on bedrest following a surgical procedure. DCS objected to the continuance. The trial court granted Father's motion and continued the fact-finding hearing to January 24, 2019. DCS filed a continuing objection, noting that Mother had not waived the statutory timeframes and the January 24, 2019 hearing date was outside the 180-day statutory timeframe. The trial court did not rule on DCS's continuing objection. On January 24, 2019, the trial court conducted a fact-finding hearing and, although represented by counsel, Mother failed to appear despite being aware of the date. At the hearing, DCS moved to continue as she was the new DCS counsel in the county and was not familiar enough with the case to move forward with the hearing. Mother and Father, by counsel, moved to dismiss because the fact-finding hearing had not been commenced within the statutory timeframe—DCS

agreed.  On February 1, 2019, the trial court entered its order, dismissing DCS's petition to terminate without prejudice.

[13] Nevertheless, four days later, on February 4, 2019, the trial court set aside its earlier order granting dismissal and set a hearing on the motion to dismiss for February 13, 2019.  After the hearing, the trial court denied the parents' motions to dismiss and set the factfinding hearing for March 27, 2019.  DCS sought a continuance of the hearing due to the unavailability of a witness, noting that Mother did not object.  Accordingly, the trial court granted the motion and re-set the hearing for June 14, 2019.  DCS again sought a continuance due to the unavailability of its FCM.  Mother did not object and the trial court granted the continuance.  The fact-finding hearing ultimately occurred on July 11, 2019.  At the commencement of the hearing, Mother moved to dismiss the Cause because the fact-finding hearing was not commenced within the statutory time period.  DCS objected and the trial court affirmed its prior ruling denying the motion to dismiss.

[14] The record is clear that at no point during the proceedings did Mother object to the trial court setting the hearing outside the statutory timeframes and she equally failed to object when DCS sought continuances when its witnesses and counsel could not attend the hearing.  *See In re J.C.* 134 N.E.3d 419, 426 (Ind. Ct. App. 2019) (trial court did not err when it denied mother's motion to dismiss when, among others, she failed to object to the court setting hearings outside the statutory timeframes); *Matter of N.C.,* 83 N.E.3d 1265, 1267 (Ind. Ct. App. 2017) (father is not entitled to relief when he acquiesced to fact-finding

hearing being held 222 days after the termination petition was filed). Accordingly, as Mother acquiesced in the setting of the hearing outside the statutory timeframe, she cannot now complain and we conclude that the trial court properly denied her motion to dismiss.

## II. *Termination of Parental Rights*

### A. *Standard of Review*

[15] Mother also challenges the termination of her parental rights to her Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[16] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

## B. *Termination of Parental Rights Statute*

[17] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

[18] Mother's main claim is focused on the allegation that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Children have not been remedied.[3] It is well-established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied.* In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21.

failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id.* Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[19]  Mother's argument focuses on the fact that the trial court relied solely "on the historical failures of Mother rather than on her capacity to parent the Children at the time of the termination hearing." (Appellant's Br. p. 20). In support of her argument that the trial court's findings are inadequate to support the conclusion that the reasons given for the removal of the Children would not be remedied, Mother relies on *In re C.M.*, 960 N.E.2d 169, 175 (Ind. Ct. App. 2011), in which we reversed the trial court's termination of parental rights as the trial court's sole reliance on the parent's historical conduct was insufficient to support the termination. This court reasoned that

> the [trial] court's focus on historical conduct, absent factual findings as to Mother's current circumstances or evidence of

changed conditions, is akin to terminating parental rights to punish the parent. And, without more, the findings are insufficient to establish each element necessary to support the conclusion that termination is warranted in this case.

*Id*. In *In re C.M*., the evidence reflected that Mother had made a significant change in her circumstances, which the trial court had failed to consider in its decision to terminate her parental rights. *Id*. at 172. She had given birth to twins during the underlying CHINS proceedings, and the twins remained in her care at all time. *Id.* Upon visiting Mother's home, DCS declined to initiate CHINS proceedings with respect to the twins. *Id*. at 172. Mother had voluntarily enrolled in an IOP, her drugs screens were all negative, and she was receiving unemployment benefits. *Id*.

[20] None of these changed circumstances exist here. Rather, by Mother's own admission, she "kind of just gave up fighting." (Tr. Vol. II, p. 94). She failed to take any action to improve her situation or to support the Children since the dispositional order was entered on July 20, 2017. Mother also conceded that she did not contact the FCM on a weekly basis, notify DCS of her change of address or employment, and complete the parenting and psychological assessments. In November 2016, the phone number Mother had provided to DCS stopped working and her whereabouts were unknown throughout the majority of the proceedings. Mother had participated in ten out of twenty-four scheduled visits, with the last visit occurring in August 2016. During these visits, Mother was unable to redirect the Children or provide structure.

[21]     Although Mother now also challenges the trial court's findings with respect to the sexual abuse the Children suffered, we find that these findings are supported by the evidence.  Specifically, the trial court found:

> 93. During mentoring sessions, all three (3) [C]hildren reported trauma occurred while the [C]hildren were in the parent's home, both Mother's home and Father's home.
>
> 94. [The Children's therapist] opined that [B.C.C., S.C., and B.C.] have experienced more trauma than other children have.
>
> * * * *
>
> 107 [FCM] and [CASA] testified credibly that adoption is in the [C]hildren's best interest based on (a) Mother and Father failing to maintain a relationship with the Children; (b) the amount of trauma that occurred to the [C]hildren while in the parents' care (both Mother and Father); (c) Mother and Father failing to participate in services to address the trauma to the [C]hildren and to address the reasons for removal; and (d) the progress the [C]hildren have made while in treatment and placement with [foster parent].

(Appellant's App. Vol. II, pp. 184-85).

[22]     The record reflects that at the time of the termination hearing, Mother was living with her boyfriend and his daughter and was working in Louisville. Mother also admitted that boyfriend was the individual the Children and Sibling claimed had molested them and he was a substantiated perpetrator of sexual abuse against Children and Sibling.  During the hearing, Mother testified that Children were removed because "they had been sexually abused."  (Tr.

Vol. II, p. 106). She indicated that based on conversations with the Children and Sibling, she believed that Children had been actually sexually abused. The FCM testified that DCS substantiated the abuse based on statements made by the Children during their forensic interviews, as well as interviews with witnesses and alleged perpetrators. In addition, the Children's therapist who worked with the Children on behavior modification and educational support, testified that the Children had discussed some of the trauma that had happened "in their parent's house" during therapy sessions. (Tr. Vol. III, p. 5).

[23] "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Mindful of this guideline, we note that the evidence presented clearly and convincingly shows that a reasonable probability exists that the conditions that led to the Children's removal from Mother's care will not be remedied, especially in light of the fact that Mother was living with the substantiated perpetrator of the sexual abuse at the time of the termination hearing. At no point during the proceedings did Mother exhibit a turnaround in her behavior or commence participation in DCS's services. A parent's habitual unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the removal conditions will not change. *In re G.M.*, 71 N.E.3d 898, 908 (Ind. Ct. App. 2017). Accordingly, the trial court was entitled to weigh the evidence as it found

appropriate in the context of this case, and we conclude that the trial court's findings support the judgment.[4]

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying Mother's motion to dismiss; and that DCS presented sufficient evidence to support the trial court's Order terminating Mother's parental rights to the Children.

Affirmed.

Mathias, J. and Tavitas, J. concur

---

[4] Mother does not argue that the trial court's termination of parental rights is not in the Children's best interest.